CHRISTOPHER D. FERRARA
Attorney at Law
1056 Hunakai St.
Honolulu, Hawaii
Cell: 808 479 8420
Office: 808 522 1660
Fax: 808 522 1661
808-479-8420
chrisair312@gmail.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TAKASHI FURUTA, | ) | CIVIL NO. 19-CV-00617-JAO-KJM |
| | ) | |
| Plaintiff, | ) | PLAINTIFF TAKASHI FURUTA'S |
| | ) | MEMORANDUM IN OPPOSITION TO |
| vs. | ) | DEFENDANT HAWAIIAN AIRLINES, |
| | ) | INC's MOTION TO STRIKE OR |
| HAWAIIAN AIRLINES, INC., a Foreign Profit | ) | EXCLUDE PLAINTIFF'S EXPERT |
| Corporation; and DOES 1-50, | ) | WITNESSES; DECLARATION OF |
| | ) | COUNSEL; EXHIBITS A - D. |
| Defendants. | ) | |
| | ) | Trial Date: September 6, 2022 |
| | ) | |
| _____ | ) | Judge: The Honorable Jill A. Otake |

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. *ii.*

TABLE OF AUTHORITIES ...................................................... ............*iii.*

I.    Introduction ...........................................................................................1
II.   Description of Incident ...................................................................... 1
III.  The Opinions of Plaintiff's Experts Relate to His
      Claims Under the Montreal Convention ...................................................2
      A.    The Montreal Convention...............................................................2
      B.    Plaintiff's Experts ......................................................................4
IV.   Defendant's Motion to Strike or Dismiss Should be Denied........................5
      A.    Defendant's Sweeping Motion to Strike
            is Disfavored by FRE 702...........................................................5
      B.    Defendant's Motion is Effectively
            a Motion for Summary Judgment
            Requiring An *In Limine* Hearing...................................................5
      C.    A Liberal Standard is Employed in Evaluating
            the Admissibility of Expert Testimony...........................................7
V.    Plaintiff's Experts Are Reliable and Will Assist the Trier of Fact .............10
      A.    Jack Hareland..........................................................................10
      B.    Steve Businger, Ph.D................................................................12
      C.    Kelly Lance, MSN, APRN, FNP-C and Robert Marvit, M.D..........................14
VI.   Conclusion............................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Bourjaily v. United States*, 483 U.S. 171 (1987)....................................................6
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)..............................7,8,9
*General Electric Co. v. Joiner*, 522 U.S. 136 (1997)...............................................8
*In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 744 (3d Cir. 1994)...................................9

*In Re: TMI Litigation*, 199 F.3d 158 (3rd Cir., 2000) .............................................................6

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,*
    842 F. Supp. 2d 682, 2012 WL 2568972, at 15 (S.D.N.Y. 2012)................................7

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998)..........................................6,7

*Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412 at 418. (3d Cir. 1999*)*......................................6

*Ruiz-Troche v. Pepsi Cola,* 161 F.3d 77, 85 (1st Cir. 1998)....................................................9

*United States v. 14.38 Acres of Land Situated in*
    *Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)...............................8

*United States v. Pansier*, 576 F.3d 726, 737 (7th Cir.2009).................................................15

## Statutes and Rules

*Fed.R.Ev.* 702 ........................................................................................... 4, 5, 8, 9

*Fed.R.Ev.* 703 ............................................................................................. 15

## Other

*Montreal Convention ("MC99")* ...................................................................... 2,3,6

*National Institute of Health, National Library of Medicine,*

*MedlinePlus Medical Encyclopedia*, www.medlineplus.gov) ...................................13

*Revised Limits of Liability Under the Montreal Convention of 1999*,
    www.icao.int. ...................................................................... 4

*Warsaw Convention* ........................................................................................ 2

*iii.*

**PLAINTIFF TAKASHI FURUTA'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANT HAWAIIAN AIRLINES, INC.'S**
**MOTION TO STRIKE OR EXCLUDE PLAINTIFF'S EXPERT WITNESSES**

## I.   Introduction

Defendant Hawaiian Airlines, Inc. (HAL, hereinafter) moves to strike or exclude all of Plaintiff's liability and damages experts relating to claims of injuries and damages sustained when the HAL aircraft flew into severe turbulence during a flight from Japan to Honolulu.

## II.   Description of Incident

On November 15, 2017, Plaintiff Takashi Furuta ("Plaintiff" or "Mr. Furuta," herein) was a passenger of Defendant HAL's Flight HA450 from Osaka to Honolulu. Several hours out from Honolulu the aircraft began experiencing chop and fasten seatbelt notifications were issued. At the time of the instructions, Plaintiff had just exited a forward restroom and was heading back to his seat at 35B. The buffeting or "chopping" of the aircraft made it difficult for Mr. Furuta to move swiftly. To steady himself against the rocky ride, he was compelled to grip on to the headrest seat backs on either side of the aisle.

Shortly after resuming his seat Mr. Furuta was injured when the plane encountered sudden and severe turbulence propelling Plaintiff and an adjacent Flight Attendant into the ceiling before they fell back onto the seats of the aircraft.  The severe turbulence hit while the Flight Attendant standing next to Mr. Furuta's seat was in the midst of conducting

1

seatbelt checks. Five other passengers were also thrown about the cabin and the plane incurred significant structural damage from passengers impacting the ceiling.

### III.   The Opinions of Plaintiff's Experts Relate to His Claims Under the Montreal Convention

#### A.   The Montreal Convention

The Montreal Convention (MC99, hereinafter)(formally, the Convention for the Unification of Certain Rules for International Carriage by Air) is a multilateral treaty adopted in 1999 at a diplomatic meeting of the International Civil Aviation Organization ("ICAO") member states. The MC99 amended provisions of the Warsaw Convention's rules concerning compensation for the victims of air disasters.

The MC99 attempts to establish uniformity and predictability of rules relating to the international carriage of passengers, baggage and cargo, including the compensation of passengers injured in accidents.  It protects passengers by introducing a two-tier system of liability that eliminates the previous requirement of proving willful neglect by the air carrier where there is less than US$175,000[1] in damages ("Tier 1").

The bar for meeting the elements of a carrier's liability for injury under its Tier 1 provisions is low. Chapter III of the Montreal Convention addresses the liability of the

---

[1] This is believed to be the current value of the Special Drawing Rights.

carrier and the extent of compensation for damages.  Chapter III, Article 17 (1) of the

Monteal Convention provides:

> ***The carrier is liable for damage sustained in case of*** death
> or ***bodily injury of a passenger upon condition only that
> the accident which caused the*** death or ***injury took place
> on board the aircraft*** or in the course of any of the operations
> of embarking or disembarking.

Chapter III, Article 21 of the MC99 provides for the above-referenced two tiers of

compensation for damages and injuries sustained by passengers in aircraft accidents.  The

original text of Article 21 provided:

1.    For damages arising under paragraph 1 of Article 17 not exceeding
      100,000 Special Drawing Rights for each passenger, ***the carrier shall
      not be able to exclude or limit its liability***.

2.    The carrier shall not be liable for damages arising under paragraph 1
      of Article 17 to the extent that they exceed for each passenger
      100,000 Special Drawing Rights ***if the carrier proves that:***

      (a)    ***such damage was not due to the negligence or other
             wrongful act or omission of the carrier or its servants or
             agents***; or
      (b)    such damage was solely due to the negligence or other
             wrongful act or omission of a third party.

*Montreal Convention*, Chapter III, Article 21.

Under the original text of Article 21, 1., referred to herein as "Tier 1," the

carrier is liable to passengers for damages sustained in accidents on board the plane up to

3

100,000 Special Drawing Rights (SDR) irrespective of the cause. The SDR has since been revised upwards.

Special Drawing Rights consist of a mix of currency values established by the International Monetary Fund (IMF) and the amount of the SDR is recurrently adjusted upwards to account for inflation. It is currently believed to be set at 128,821.00 SDR or $175,000 USD. *Revised Limits of Liability Under the Montreal Convention of 1999*, www.icao.int.

Under the most recent calculations, this comes to $175,000 USD.

Tier 2, paragraph 2 of Article 21 sets out that the carrier is liable to pay more than $175,000 USD to passengers for injuries and damages sustained on board in accidents **unless the carrier proves it was not negligent**. In other words, the burden is on the air carrier to prove that it, its employees, servants and/or agents were not negligent.

### B.   <u>Plaintiff's Experts</u>

Plaintiff's experts Steve Businger, Ph.D., Jack Hareland, Robert Marvit, M.D. and Kelly Lance,  MSN, APRN, FNP-C  have submitted reports and expect to testify as to liability and damages. (See Exhibits 1-4 attached hereto and made a part hereof). Their testimony is directly relevant to the provisions of the MC99. Mr. Businger, a meteorologist and flight expert Hareland find HAL negligent in the operation of its aircraft and flight

4

planning. Dr. Marvit's and Kelly Lance,  MSN, APRN, FNP-C 's opinions relate to the

physical injuries and economic damages sustained by Mr. Furuta.

## IV.    Defendant's Motion to Strike or Dismiss Should be Denied

### A.    Defendant's Sweeping Motion to Strike is Disfavored by FRE 702

Defendant HAL's omnibus request to strike the full slate of Plaintiff's disclosed

experts constitutes a gratuitous squandering of judicial resources and  is discouraged in

both the Commentary to FRE 702  and by construing cases.

> . . . **this amendment is <u>not intended to provide an excuse for an</u>**
> <u>**automatic challenge to the testimony of every expert.**</u> See <u>Kumho Tire</u>
> <u>Co. v. Carmichael,</u> 119 S.Ct. 1167, 1176 (1999) (noting that **the trial judge**
> **has the discretion "both to avoid unnecessary 'reliability' proceedings**
> in ordinary cases where the reliability of an expert's methods is properly taken
> for granted, and to require appropriate proceedings in the less usual or more
> complex cases where cause for questioning the expert's reliability arises.").

*Committee Notes on Rules—2000 Amendment*, FRE 702. (emphases added).

Counsel for Defendant HAL have asserted just such an "automatic challenge to the

testimony of every expert . . " identified by Plaintiff. Plaintiff's case involves not unusual

personal injury claims arising out of clear and unquestioned severe aircraft turbulence.

## B.    Defendant's Motion is Effectively a Motion for Summary Judgment Requiring An *In Limine* Hearing

Defendant HAL advocates a summary striking of Plaintiff's Flight and Meteorological experts as well as his experts on medical care and special damages. If granted, this would potentially serve as a summary judgment against Plaintiff's claims for entitlement to the Tier 2 benefits of the Montreal Convention since the conjunctive criteria for meeting Tier 2 are damages exceeding the currently established Special Drawing Units and negligence on the part of the operators, managers and or owners of the aircraft. The opinions of Plaintiff's experts on medical care and treatment and medical special damages represent significant injuries and special damages and those of his meteorological and flight experts directly find Defendant HAL negligent.

Motions in limine are required where the issue of striking witnesses implicates potential summary judgment on a claim or portion of claims. The Third Circuit in *In Re: TMI Litigation*, 199 F.3d 158 (3rd Cir., 2000) held:

> "*[we] have long stressed the importance of in limine hearings under* [FRE] *Rule 104(a) in making the reliability determination required under* [FRE] *Rule 702 and Daubert."* [citations omitted], especially when a Daubert challenge is made in the context of a summary judgment motion *or where summary judgment will inevitably be granted if the proffered evidence is excluded.*" . . . failure to hold [an in limine] hearing may be an abuse of discretion."

*In Re: TMI Litigation*, 199 F.3d 158 (3rd Cir., 2000) citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412 at 418. (3d Cir. 1999). (bracketed material and emphases added).

6

At the trial court level in _Padillas_, the District Court held extensive _in limine_ hearings lasting nearly five weeks on the Admissibility of expert testimony which afforded the proponent ample opportunity to present the bases for the opinions and proposed testimony of the challenged experts.  _In Re: TMI Litigation_, 199 F.3d 158 (3rd Cir., 2000) amending its decision in 193 F.3d 613 (1999) and citing _Padillas v. Stork-Gamco, Inc._, 186 F.3d 412 at 418. (3d Cir. 1999).

Motions in limine are necessary where striking would lead to claim foreclosure because FRE 104(a) has been held to provide that the proponent of expert testimony has the burden of establishing the admissibility requirements by a preponderance of the evidence. _See_ _Bourjaily v. United States_, 483 U.S. 171 (1987) and _Moore v. Ashland Chemical, Inc.,_ 151 F.3d 269 (5th Cir. 1998)..

Defendant's effort to strike or exclude Plaintiff's experts necessitates that it be conducted through a motion in limine because if granted it will serve as a summary judgment of his claims under Tier 2 of the Montreal Convention.

Defendant HAL has previously raised the issue of liability and MC99 Tier 2 benefits in its motion for summary judgment. The instant motion to strike is now its second, re-litigation of its contentions.

7

**C.**    **A Liberal Standard is Employed in Evaluating the Admissibility of Expert Testimony**

The issues raised by Defendant HAL as to the qualifications, opinions and reports of Plaintiff's experts do not arise to any clear justification for barring their testimony and instead comprise the usual factors of cross examination before the ultimate fact finder.

Courts value vigorous confrontation and cross examination over exclusion of expert testimony. Courts and the _Federal Rules of Evidence_ "favor the admissibility of expert testimony and [the rules] are applied with a 'liberal thrust.'" _MBIA Ins. Corp. v. Patriarch Partners VIII, LLC_, 842 F. Supp. 2d 682, 2012 WL 2568972, at 15 (S.D.N.Y. 2012). (bracketed material added).

In _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579 (1993), the Supreme Court held that the twin standards of Rule 702—relevance and reliability—are incompatible with the prior stricter "general acceptance" test. Under its revised standard, the Court encourages a more liberal approach to admitting expert testimony, stressing the importance of subjecting witnesses to vigorous cross-examination before the fact finder rather than the bar of opinion testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." _Daubert_, _supra_, at 595.

The decision in Daubert to relax the admissibility standards of expert testimony was further examined. In _General Electric Co. v. Joiner_, 522 U.S. 136 (1997), where the Court

8

emphasized the importance of expert methodology, opposed to focusing solely on conclusory opinions, finding that "conclusions and methodology are not entirely distinct from one another." Accordingly, fact finders are entitled to consider the methodology of expert testimony and come to their own conclusions about ultimate determinations.

As noted in the Committee Notes on FRE 702, subsequent courts have accordingly followed, urging testimony be left for the fact finder to determine the value of expert testimony.

> A review of the case law after Daubert shows that **the rejection of expert testimony is the exception rather than the rule**. . . . "**the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."** United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996).

*Committee Notes on Rules—2000 Amendment*, FRE 702. (Emphases added).

Expert opinion is accordingly admissible where it is _reliable_ and _helpful_ to the fact finder.  Proponents of expert opinion do ". . . not have to demonstrate . . . by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994). Similarly, _Daubert_, *Supra*, (scientific experts might be permitted to testify if they could show that the methods they used were also employed by "a recognized minority of scientists in their field.");

9

_Ruiz-Troche v. Pepsi Cola,_ 161 F.3d 77, 85 (1st Cir. 1998) ("Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.")

The second prong of the test for admitting an expert's testimony is the common sense assessment of whether it will reasonably assist the trier of fact.

> **_Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier_**. "There is no more certain test for determining when experts may be used than **_the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding_** of the subject involved in the dispute." . . . **_When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time_**.

Notes of Advisory Committee on Proposed Rules, Rule 702, FRE (emphases added, citations omitted).

V.   **Plaintiff's Experts Are Reliable and Will Assist the Trier of Fact**

The  background of experience, expertise, methodology and the opinions of Plaintiff's experts are sound, rendering their testimony reliable and helpful.

A.   **Jack Hareland**

Jack Hareland is profoundly experienced in commercial aviation flight operations and management. A former Boeing 727 Fleet Captain and Training Check Airman for a major

airline, he was responsible for training, checking and currency[2] for more than 1,200 pilots. He developed courseware to support wind shear and advanced training for a major airline. He has also served as a Project Manager for the structural re-organization of a major airline's flight training center to improve communication between management and pilots. As a Quality Assurance Flight Manager he developed a Quality Assurance Instructor Training program, course materials and tracking system.  He also served as the Flight Operations Duty Manager for a major airline responsible for risk assessment for airline daily operational events. (See Exhibit A-1, Hareland at pages 11 & 13).

Clearly Mr. Hareland has the "specialized knowledge" of commercial aviation required by FRE 701.

HAL contends that Hareland never concludes that HAL was negligent in the flight planning or piloting of HA 450. (See Defendant's Memo at page 18).  This is not correct. Mr. Hareland notes that the conditions of the Kona Low pressure system rendered it impossible to ascend sufficiently to avoid the turbulence because the aircraft's altitude was approaching a height in which the atmosphere was so thin there would not be sufficient lift and in addition the pilots failed to follow its own flight protocols to climb 1000 feet above the storm for each 10 knots of wind speed at the cloud top.  (See Exhibit A at page 3, ¶d.).

---

[2] "Currency" refers to the requirement for pilots to regularly re-certify for their aircraft.

Hareland states "The weather depiction chart clearly shows a significant weather system along the route of the flight that could have and should have been avoided." (See Exhibit A-2 at page 2, ¶a.)

> Based on the weather chart, the winds were in the range of 90knts to 130knts. This would have made it impossible to top the system [as the pilots attempted] safely while maintaining the performance capability limitations of the aircraft.

(Ex. A-2, Hareland Declaration, pg. 3, ¶d.)(bracketed material added).

> Opinion 2: . . . Based on the information available, the crew was in a weather box constrained vertically by aircraft performance above and convective weather below while laterally boxed in by cells on both sides of the aircraft. In reality this event started at dispatch. Three pilots and a dispatcher had the responsivity [sic] to pick a flight plan and a reasonable route that would have avoided significant weather systems.

(Ex. A-2, Hareland Declaration, pgs. 5-6)(bracketed material added).

Hareland's discussion contained in his initial submission (Exhibit A-1) was generated late in 2021 before Defendant HAL had disclosed its flight manual. See his report at page 5 of Ex. A-1 for missing documents from HAL. His opinions contained in Ex. A-2 incorporate subsequent but still incomplete discovery productions from HAL.

It is clear that Mr. Hareland has provided sufficient factual bases, analysis, opinion and discussion of factors from which a jury may reasonably conclude that Defendant was negligent.

12

**B.**    **Steve Businger, Ph.D.**

Defendant HAL claims that meteorologist Steve Businger, Ph.D. is not qualified to render opinions on flight planning or operation and that his findings are unreliable and irrelevant. This is not correct. In the light most favorable to HAL, the points raised in its motion are a matter for cross examination.

Dr. Businger is a senior professor in the Atmospheric Sciences Department at the University of Hawaii at Manoa where he specializes in the forecasting of hazardous weather events. He also has significant experience and knowledge of Federal Aviation Regulations that pertain to the safe and efficient planning and execution of commercial aviation flights. Dr. Businger states:

> 6.      have extensive experience in forecasting as it pertains to research flights during field experiments that I have participated in since 1984.
>
> 7.      I have taught aviation weather forecasting in my senior level weather analysis and forecasting classes since 1987.
>
> 8.      I am familiar with the relevant Federal Aviation Regulations ("FARs") that pertain to the safe and efficient planning and execution of commercial flights.

(Ex. B, Businger, pg. 2).

Dr. Businger's opinions that the flight was neither appropriately planned nor executed are relevant and based on sufficient factual bases and appropriate inferences.

C.    **Kelly Lance,  MSN, APRN, FNP-C  and Robert Marvit, M.D.**

Defendant HAL's claims relating to Nurse Practioner Kelly Lance and Robert Marvit,

M.D. present similar issues and are accordingly discussed together.

Defendant HAL contends that Kelly Lance,  MSN, APRN, FNP-C  is not qualified to

diagnose injuries or to provide price estimations of the cost of medical procedures conducted

in Japan. In fact, Nurse Practioners are highly educated providers of medical care, diagnosis

and treatment whose skills and knowledge overlap and duplicate those of medical doctors.

The National Institute of Health describes the Nurse Practitioner:

> A nurse practitioner (NP) is a nurse with a graduate degree in advanced
> practice nursing. This type of provider may also be referred to as an ARNP
> (Advanced Registered Nurse Practitioner) or APRN (Advanced Practice
> Registered Nurse).
> . . . The NP is allowed to provide a broad range of health care services, which
> may include:
> •    Taking the person's history, performing a physical exam, and ordering
>       laboratory tests and procedures
> •    Diagnosing, treating, and managing diseases
> •    Writing prescriptions and coordinating referrals
> •    Providing education on disease prevention and healthy lifestyles
> •    Performing certain procedures, such as a bone marrow biopsy or
>       lumbar puncture

(National Institute of Health, National Library of Medicine, MedlinePlus Medical Encylopedia,
www.medlineplus.gov)

As a Registered Nurse and Nurse Practitioner concentrating in life and medical care

planning and the attendant costs of past and future care, reliance on the records and

opinions of other experts and medical providers is an essential and recognized part of Life

14

Planning practice and expertise. Experts are permitted to rely on the opinions of other experts.

Dr. Marvit, while a practicing Psychiatrist, has an M.D., attended medical school and residency. The interpretation and assessment of physical injuries is an integral part of his ability to treat his psychiatric patients.  In assessing qualifications courts have emphasized breadth of experience in addition to specific education or areas of practice. Courts must "consider the proposed expert's *full range of experience and training*" not just an expert's professional qualifications. <u>United States v. Pansier</u>, 576 F.3d 726, 737 (7th Cir.2009) (emphases added).

Both Dr. Marvit and Nurse Practitioner reasonably rely on the records, findings and diagnoses of other experts. The term "data" is intended to encompass the reliable opinions of other experts. See the original *Advisory Committee Note* to FRE 703. The language "facts or data" is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence. *Id.*

Under its system of universal health care, medical treatment is provided free for citizens of Japan as well as non-citizens staying in Japan for more than a year. Kelly Lance utilized US data to arrive at the best and probable estimate of the cost of the procedures conducted on Mr. Furuta in Japan.

15

As with HAL's contentions concerning Mr. Hareland and Professor Businger, its issues with Dr. Marvit and Nurse Practitioner Kelly are matters best left for cross examination and confrontation.

**VI.   <u>Conclusion</u>**

Defendant HAL has failed to provide any expert opinion or evidence that Plaintiff's experts' opinions and methods are not accepted, unreliable or will not assist the trier of fact. A review of the submissions from Plaintiff's experts in fact demonstrates they are reliable and helpful to the fact finder.

For the foregoing reasons and authorities, Defendant's motion should be denied in its entirety.

DATED: Honolulu, Hawaii, July 15, 2022.

<u>/S/ Christopher Ferrara</u>
CHRISTOPHER FERRARA

Attorney for Plaintiff
Takashi Furuta

16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TAKASHI FURUTA, | ) | CIVIL NO.: 19-CV-00617-JAO-KJM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF COUNSEL;** |
| vs. | ) | **EXHIBITS A - D** |
| | ) | |
| HAWAIIAN AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DECLARATION OF COUNSEL</u>

| | |
|---|---|
| STATE OF HAWAII | ) |
| | ) SS: |
| CITY AND COUNTY OF HONOLULU | ) |

1.    I am the attorney for Plaintiff in the above-entitled lawsuit.  I make this Declaration based upon my own personal knowledge of and/or belief in the matters herein set forth.  This unsworn Declaration is made in lieu of an affidavit per LR 7.5 of the Local Rules of Practice for the United States District Court for the District of Hawaii (as amended by the U.S. District Court for the District of Hawaii, in its Order entered August 26, 2019).

2.    Exhibit A, comprising of A-1 and A-2 are true and accurate copies of submissions from Jack Hareland.

1

3.     Exhibit B, comprising of B-1 and B-2 are true and accurate copies of submissions from Steve Businger, Ph.D.

4.     Exhibit C is a true and accurate copy of the report and materials from Robert Marvit, M.D.

5.     Exhibit D is a true and accurate copy of the report and materials from Kelly Lance, MSN, APRN, FNP-C .

6.     I declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 15, 2022.

/s/ Christopher Ferrara

_____
CHRISTOPHER FERRARA

2